UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ANDRA WILLIAMS,

        Plaintiff,

  v.                                                Case No. 19-cv-0118-bhl

CITY OF MILWAUKEE, et al.,

        Defendants.

## DECISION AND ORDER

      In 2016, Andra Williams, an African American Captain of Police with the Milwaukee Police Department (MPD), applied for two different Emergency Communications positions within the MPD and City of Milwaukee. Despite significant relevant experience—he had headed MPD's 9-1-1 dispatch and call centers for almost eight years—Williams was not offered either role. According to Former Police Chief Edward Flynn and City Director of Administration Sharon Robinson, they passed over Williams because he lacked qualities they thought essential to the positions. According to Williams, what he really lacked was the proper race and gender. After filing a charge of discrimination with the Equal Employment Opportunity Commission (EEOC), Williams received a Notice of Right to Sue and then filed a discrimination complaint in this Court on January 22, 2019. (ECF No. 1.) In his complaint, Williams alleges the City of Milwaukee, through the actions of Flynn and Robinson, discriminated against him on the basis of his race and gender when they refused to hire him for the Emergency Communications positions in violation of 42 U.S.C. §1981 and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e. (*Id*. at 2.)

      On September 8, 2020, all Defendants moved for summary judgment. (ECF No. 22.) Because there are genuine issues of material fact with respect to Williams' discrimination claims arising from former Police Chief Flynn's rejection of Williams for the Emergency Communications Manager position, the Court will deny Defendants' motion as to those claims. But the record is insufficient to permit a reasonable jury to find in Williams' favor on his

discrimination claims related to Robinson's refusal to hire him for the Emergency Communication and Policy Director position, so the Court will grant summary judgment in favor of Defendants on those claims.

## FACTUAL BACKGROUND[1]

### 1. The Emergency Communications Manager Position

From July 30, 2006 to September 17, 2011 and again from June 21, 2013 to March 7, 2016, Andra Williams was a sworn Captain of Police, in charge of the MPD's 9-1-1 dispatch and call centers. (ECF No. 34 at 3.) As Captain to the Communications Division, he was responsible for day-to-day operations and implementing then-Police Chief Flynn's long-term strategic vision. (*Id*.) Flynn wanted to prioritize call response efficiency, so Williams created a database to track officer performance on the Differential Police Response program, which tests how police respond to calls for service. (*Id*.) Williams also worked to develop the OpenSky 911 and computer ID dispatch system whereby calls made to the County went directly to the MPD. (*Id*. at 4).

As part of its 2016 City Budget, Milwaukee decided to create an Emergency Communications Manager position to replace the role of Captain to the Communications Division that Williams occupied. (ECF No. 1 at 3.) The Emergency Communications Manager was to be a civilian who would control the MPD's 9-1-1 dispatch and call centers, direct 180 employees, including sworn officers and civilians, and possess specialized knowledge of the software and infrastructure platform used in the Communications Division. (*Id*. at 4.) Because of his experience in the Division, Williams applied for the new Emergency Communications Manager position ahead of his July 8, 2016 full duty retirement. (ECF No. 31 at 8.) He was one of eight qualified candidates selected to interview with an independent, three-person panel on June 21, 2016. (*Id*. at 9.) Based solely on the interview scores, Williams ranked first among the candidates. (*Id*.) However, the final memo provided by HR Specialist Pamela Roberts ranked Williams second behind Jill Price, a White female. (*Id*.)

Although it was typical for the Chief and Assistant Chiefs to conduct second-round interviews with the finalists, Flynn scheduled a single 30-minute interview with Price only and

---

[1] These facts are drawn from admitted allegations in the Complaint (ECF No. 1), the parties' proposed statements of facts (and responses) (ECF Nos. 24, 31, and 34), Plaintiff's Brief in Response to Defendants' Motion for Summary Judgment (ECF No. 30), and the Declaration of Jenny Yuan in Support of Defendants' Motion for Summary Judgment (ECF Nos. 29-15 and 29-16.) Disputed facts are viewed in the light most favorable to the non-moving party.

then offered her the position. (*Id*. at 9-10.) Price initially accepted, only to withdraw after realizing the new job would result in a lesser salary bump. (*Id*. at 12.) Rather than entertain the other qualified candidates, as was standard practice if the first choice declined, Flynn instead re-posted the position. (*Id*. at 13-14.) He ultimately hired a White male, Robert Malasuk, who was the former Chief of Police for the Village of Greendale. (*Id*. at 16). When asked to explain why he had selected Malasuk, Flynn's only response was that Malasuk had 34 years of law enforcement experience managing communications for Greendale. (*Id*.)

Williams alleges that Flynn's decision not to hire him was racially motivated. (ECF No. 1 at 4-5.) Flynn maintains, however, that Williams was simply incapable of carrying out his strategic vision for Communications, and he preferred a civilian head of the department. (ECF No. 24 at 6.) Specifically, Flynn testified:

> When I was the police chief in Springfield, Massachusetts, with about 160,000 people, we had a civilian manager of the Communications Division, and what I saw in the value of it was, A, they had a commitment to that function as their career path; B, having a civilian in that function provided a career path, theoretically, for people who chose the Communications world as their career . . . And [C], it provided an outside perspective. You know, policing is kind of a parochial, insular world in many ways, and I felt that having a civilian in that function that was not a police officer . . . would provide benefit.

(ECF No. 29-3 at 7 (Flynn Dep. 21:18-22:16).)

Williams relies on a web of interrelated incidents to support his allegations of discrimination, but the most important is Flynn's tirade following an Advanced in Management (AIM) meeting in the Fall of 2015. (ECF No. 30 at 5-6.) MaryNell Regan (Regan), then Executive Director to the City of Milwaukee Fire and Police Commission, was present after the AIM meeting along with Mayor Tom Barrett, Barrett's chief of staff Patrick Curley, Flynn, and Flynn's chief of staff Joel Plant. (ECF No. 31 at 3.) Regan testified:

> Chief Flynn got very upset, real red in the face, upset about—I think even slammed his hands down a couple times—very upset about minorities and lesbians that were coming after him. And he saw in the future that he would go down like Chief Jones,[2] and he wasn't going to let that happen, and he was outraged because he had promoted many of those same people, and then he rattled off the list of names.

(ECF No. 29-16 at 8 (Regan Dep. 23:7-17).) That list of names comprised five minority officers: Captain Andra Williams, Captain Regina Howard (African American and female), Assistant Chief

---

[2] This refers to a lawsuit brought by police lieutenants against Chief Jones, alleging that he chose not to promote them for racially discriminatory reasons.

Edith Hudson (African American and female), Captain Alfonso Morales (Hispanic and male), and Captain Eric Moore (African American and male). (*Id*. at 23:19-20.) Regan also recalled Flynn saying "he was going to need to put [these minorities and lesbians] somewhere where they could do no harm; reassign them to where they could do no harm." (*Id*. at 24:5-8.) This type of transfer is known as "closeting." (ECF No. 31 at 3.)

On August 2, 2015 and again on October 20, 2015, Flynn transferred Regina Howard to positions where she had no one to command and little if anything to do. (*Id*. at 5.) He put Eric Moore in a recruiter position despite captains not being involved in recruitment. (ECF No. 29-15 at 7 (Howard Dep. 22:14-16).) He transferred Alfonso Morales to a closet in the Investigations and Intelligence Bureau. (*Id*. at 22:24-23:2.) And he even transferred Williams out of the Communications Division in February 2016 rather than let him stay on to train his civilian successor. (ECF No. 30 at 7.)

**2. The Emergency Communications and Policy Director Position**

On February 16, 2016, the Department of Administration (DOA) posted a new position identified as Emergency Communications and Policy Director, which was intended to consolidate Information Technology operations with City departments such as the MPD, Department of Public Works (DPW), and the Fire Department. (ECF No. 31 at 4.) Williams applied for this position because it was similar to the Emergency Communications Manager role, and he had the requisite experience. (*Id*. at 8.)

Director Robinson oversaw hiring for the position. (*Id*.) She put together an interview panel that included herself, Paula De Haan, Captain Felician from the MPD, Jeffrey Tews from the DPW, and an Assistant Fire Chief from the Fire Department. (*Id*.) This panel interviewed three qualified candidates: Andra Williams, Debra Wilichowski, and Christian Lyons (both Wilichowski and Lyons are White). (*Id*.) Following the interviews, Robinson decided to hire Wilichowski for the position, subject to her meeting with the mayor. (*Id*. at 9.) But that meeting with the mayor never happened, so Robinson did not offer Wilichowski the position. (*Id*. at 10.) Instead of reconsidering Williams or Lyons, Robinson offered the job to De Haan, a Hispanic female who had served on the interview panel but had never submitted a cover letter or resume for the position. (*Id*.) According to MaryNell Regan, this was the first time in her 18 years with the City that a position was filled by a member of the interview panel. (*Id*. at 11.)

Robinson claims that she would never have chosen Williams to be the new Emergency Communications and Policy Director because she was disappointed with his interview and believed he lacked the vision and skills required for the position. (ECF No. 24 at 22.) But Williams contends that Robinson's deviation from standard procedure is evidence that he was discriminated against on the basis of sex. (ECF No. 30 at 18.)

## SUMMARY JUDGMENT STANDARD

"Summary Judgment is appropriate where the admissible evidence reveals no genuine issue of any material fact." *Sweatt v. Union Pac. R. Co.*, 796 F.3d 701, 707 (7th Cir. 2015) (citing Fed. R. Civ. P. 56(c)). Material facts are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of "material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. If the parties assert different views of the facts, the Court must view the record in the light most favorable to the nonmoving party. *E.E.O.C. v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000).

## ANALYSIS

In his complaint, Williams alleges that the City of Milwaukee, through Flynn and Robinson, discriminated against him on the basis of race and sex in violation of both 42 U.S.C. §2000-e and 42 U.S.C. §1981. (ECF No. 1 at 4-6.) Williams' attorney clarified at a September 15, 2021 status hearing that his Title VII and Section 1981 discrimination claims relating to his non-hiring by Flynn are based solely on race (not sex) and his claims relating to Robinson's failure to hire him are based solely on sex discrimination (not race). (ECF No. 40 at 31:15-32:06.) Thus, the Court will take the surviving allegations in turn, first evaluating Williams' race discrimination claims involving Flynn, and then his sex discrimination claims involving Robinson.

**I.  A Reasonable Jury Could Conclude that Williams Was Not Hired for the Emergency Communications Manager Position Because of His Race.**

Williams claims that the City and former Police Chief Flynn discriminated against him based on his race when they refused to hire him for the Emergency Communications Manager position. (ECF No. 1 at 4-6.) Defendants dispute this and insist Williams was not hired for legitimate non-discriminatory reasons. (ECF No. 23 at 2-3.)

When analyzing claims of employment discrimination under both Title VII and Section 1981, the Court uses the burden-shifting approach established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See O'Neal v. City of New Albany*, 293 F.3d 998,

1003 (7th Cir. 2002). Under this regimen, the Court looks first to see whether the plaintiff has made a prima facie case of discrimination. At this initial step, the "plaintiff must show that: (1) he is a member of a protected class; (2) he applied for and was qualified for an open position; (3) despite his qualifications, he was rejected for the position; and (4) a similarly situated person outside his protected class was hired for the position instead, or the position remained open" and the employer continued to seek applications from candidates with similar qualifications. *Sweatt*, 796 F.3d at 709; *see Ost v. W. Suburban Travelers Limousine, Inc.*, 88 F.3d 435, 440 (7th Cir. 1996). If the plaintiff establishes this prima facie case, the burden shifts "to the defendant to 'articulate a legitimate, nondiscriminatory reason for the adverse employment action . . . .'" *Simpson v. Franciscan All., Inc.*, 827 F.3d 656, 661 (7th Cir. 2016) (quoting *Andrews v. CBOCS W., Inc.*, 743 F.3d 230, 234 (7th Cir. 2014)). "Should the employer meet its burden, the plaintiff must show by a preponderance of the evidence that the employer's proffered reasons were merely a pretext for discrimination." *Moser v. Indiana Dep't of Corr.*, 406 F.3d 895, 900-01 (7th Cir. 2005). "To demonstrate pretext, [Plaintiff] must show: (1) the [defendant's] nondiscriminatory reason was dishonest'; and (2) that the [defendant's] 'true reason was based on a discriminatory intent.'" *Hobbs v. City of Chicago*, 573 F.3d 454, 461 (7th Cir. 2009) (quoting *Fischer v. Avanade, Inc.*, 519 F.3d 393, 403 (7th Cir. 2008)).

  **A. Williams Has Established a Prima Facie Case of Racial Discrimination on the Emergency Communications Manager Position.**

Defendants do not contest that Williams has satisfied the first three prongs of his prima facie case. (ECF No. 23 at 7.) Williams is an African American and thus a member of a protected class under the relevant statutes. (ECF No. 1 at 2.) He had almost eight years of experience in the predecessor to the Emergency Communications Manager position, (*Id*. at 3), and Flynn acknowledged Williams' ample qualifications, (ECF No. 29-3 at 18-19 (Flynn Dep. 65:7-67:23)). And he was of course rejected for the position. (ECF No. 1 at 4.)

It is on the fourth, "similarly situated" prong that the parties disagree. Williams alleges that he and Price were similarly situated. Defendants disagree, highlighting what they contend is a key dissimilarity: "Price had the qualities Flynn was looking for in a manager over the [Technical Communications Division]," whereas "Williams had already demonstrated to Flynn that he was unable to execute Flynn's strategic vision for the Communications Division." (ECF No. 23 at 8.)

But Defendants have confused Plaintiff's first-step burden of proving a prima facie case with their own second-step burden of producing a legitimate, non-discriminatory explanation for choosing Price over Williams. At this stage, Williams need not counter Flynn's proffered justification for preferring Price. Indeed, the prima facie burden is not meant to be so onerous. *See Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012). "So long as the distinctions between the plaintiff and the proposed comparators are not 'so significant that they render the comparison effectively useless,' the similarly-situated requirement is satisfied." *Id.* at 846 (quoting *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007)). Further, "[w]hether a comparator is similarly situated is 'usually a question for the fact-finder,' and summary judgment is appropriate only when 'no reasonable fact-finder could find that plaintiffs have met their burden on the issue.'" *Coleman*, 667 F.3d at 846-47 (quoting *Srail v. Village of Lisle*, 588 F.3d 940, 945 (7th Cir. 2009)).

Williams and Price had comparable qualifications. (ECF No. 30 at 11.) Based on interviews, an independent panel ranked Williams first and Price second with a difference of only two points between them. (ECF No. 29-3 at 18 (Flynn Dep. 64:12-20).) A reasonable factfinder could certainly deem them similarly situated. Nothing more is required at this juncture.

### B. Defendants Have Articulated a Legitimate, Non-Discriminatory Reason for Choosing Price Over Williams.

Williams led the Technical Communications Division on two separate occasions during Flynn's tenure as Chief of Police. (ECF No. 23 at 11-12.) While Flynn did not question Williams' integrity, sincerity, purpose, dedication, or competence, he wanted to move the Division in a new direction consistent with his vision. (ECF Nos. 30 at 12 & 23 at 12.) He contends he believed Jill Price had the qualifications, skills, and experience necessary to help him effectuate this vision, while Williams did not. (ECF No. 23 at 10.) This is enough to shift the burden back to Williams. "When the plaintiff has proved a prima facie case of discrimination, the defendant bears only the burden of explaining clearly the nondiscriminatory reasons for its actions." *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 260 (1981). Flynn has done so.

### C. Williams Has Introduced Enough Evidence to Allow a Reasonable Jury to Infer Pretext.

"A pretext, in employment law, is a 'phony reason' that the employer offers for engaging in discriminatory conduct." *Mills v. First Fed. Sav. & Loan Ass'n of Belvidere*, 83 F.3d 833, 845 (7th Cir. 1996). "A plaintiff can prove that an employer's proffered reasons for an employment

decision are pretextual by one of two methods: (1) by showing that a discriminatory reason more likely than not motivated the employer . . . or (2) that the employer's proffered explanation is unworthy of credence." *Kralman v. Illinois Dep't of Veterans' Affs.*, 23 F.3d 150, 156-57 (7th Cir. 1994).

Importantly, "'the issue of pretext does not address the correctness or desirability of reasons offered for employment decisions. Rather, it addresses the issue of whether the employer honestly believes in the reasons it offers.'" *Kralman*, 23 F.3d 156-57 (quoting *McCoy v. WGN Continental Broadcasting Co.,* 957 F.2d 368, 373 (7th Cir.1992)). Thus, to survive summary judgment, the plaintiff must produce evidence sufficient to allow the trier of fact to reasonably infer that the employer did not believe its stated reasons *and* discrimination was the real reason. *See O'Neal*, 293 F.3d at 1007. "If the employee offers specific evidence from which the finder of fact may reasonably infer that the proffered reasons do not represent the truth, the case then turns on the credibility of the witnesses . . . This credibility judgment is best left to the finder of fact." *Collier v. Budd Co.*, 66 F.3d 886, 893 (7th Cir. 1995).

Williams identifies four sets of facts that he insists create a triable issue on pretext: (1) Flynn's remarks after the 2015 AIM meeting; (2) Flynn's transfers of Howard, Moore, Morales, and Williams himself; (3) Flynn's failure to follow standard operating procedure during the interview process; and (4) Flynn's decision to ultimately hire a longtime police officer despite a stated desire to civilianize Communications leadership. It may be that none of these sets of facts is hefty enough to singularly demonstrate both dishonesty and discriminatory intent, but Williams will nonetheless survive summary judgment if the totality of the evidence could lead a jury to conclude, by a preponderance of the evidence, that discrimination took place. *See Emmel v. Coca-Cola Bottling Co. of Chicago*, 95 F.3d 627, 632 (7th Cir. 1996); *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765-66 (7th Cir. 2016). In other words, the summary judgment motion must be denied if the collective weight of Williams' evidence could tilt toward pretext.

Examining the record, Flynn's 2015 AIM comments emerge as Williams' most consequential allegation, but the defense has asked the Court to tare the weight of those comments. Defendants characterize Flynn's words as "stray remarks" and analogize to *Sun v. Board of Trustees of University of IL*, 473 F.3d 799 (7th Cir. 2007) (affirming that "stray workplace remarks" are not evidence of discrimination), and *Bahl v. Royal Indem. Co.*, 115 F.3d 1283, 1293 (7th Cir. 1997) (holding that "isolated, 'stray workplace remarks' that are not clearly linked to the

decision to terminate . . . cannot defeat summary judgment . . . unless they are both proximate and related to the employment decision in question"). Flynn's remarks, they argue, are similarly irrelevant to the question of pretext as a matter of law.

Despite Defendants' efforts to downplay Flynn's comments, his statements, if truly made, are far different than those in *Sun* and *Bahl*. In both *Sun* and *Bahl*, the Seventh Circuit rejected attempts by plaintiffs to rely solely on stray remarks to survive summary judgment. In *Sun*, a tenured professor said he would not accept any Chinese graduate students as a way of showing his dissatisfaction with the length of a discussion on recruiting international students. The Court of Appeals held that this comment, made by a single professor, was insufficient to allow a jury to find that the Promotion and Tenure Committee, on which the professor did not sit, had discriminated against Professor Sun. *Sun*, 473 F.3d at 802. In *Bahl*, a company vice president asserted that Mr. Bahl had to "think Indian first" before thinking in English and referred to him as "not the type of person we want to put up in front of the brokers." *Bahl*, 115 F.3d at 1289. The Seventh Circuit similarly concluded that this comment was insufficient to prove the company's decision to fire Bahl was pretextual. *Id*. at 1294.

In the first place, the remarks Williams cites here are different than the comment in *Sun* because the alleged remark in *Sun* was not made about the plaintiff in that case but rather potential graduate students who shared the plaintiff's Chinese heritage. *Sun*, 473 F.3d at 813. Here, Flynn referred to Williams directly. *Sun* also turned on the multiple layers of review between the subordinate who made the stray remark and the ultimate decisionmakers who denied Sun tenure. *Id*. In this case, Flynn occupied both roles. More significantly, though, the remarks in both *Sun* and *Bahl* were attenuated from the challenged employment decisions, and the record contained no other reasonable means for inferring pretext. By contrast, Williams has provided three supporting pieces of evidence. Accordingly, the Court cannot dispose of his claim based solely on the "stray remarks" doctrine. If the cumulative weight of the evidence could support a finding of pretext, it is irrelevant that any individual piece of that evidence is independently insufficient. *See King v. Wiseway Super Ctr., Inc.*, 954 F. Supp. 1289, 1294-95 (N.D. Ind. 1997); *Ortiz*, 834 F.3d at 765.

Defendants are off base in arguing that Flynn's stray remarks should count for nothing at all. The Seventh Circuit has reminded courts, however, that its cases "should not be overread to mean that 'stray remarks' of a derogatory character are never evidence of discrimination. What our cases hold . . . is that if someone not involved in the decisionmaking in a plaintiff's case

expressed discriminatory feelings, that is not evidence that the decision was discriminatory." *Gorence v. Eagle Food Centers, Inc.*, 242 F.3d 759, 762 (7th Cir. 2001). Here, Flynn was the decisionmaker in this case, so his derogatory remarks, even if unrelated to an employment decision, can support Williams' case.

And Flynn's remarks *were* related to an employment decision. He divulged a plan to "closet" five subordinates, and within months, four of the five had been transferred at least once. Flynn then rejected one of those subordinates (Williams) for the very same position Flynn had transferred him from as part of an alleged scheme to relegate minorities to departments where they could do no harm. This connection between words and actions is not so lightly disregarded. *See Kogucki v. Metro. Water Reclamation Dist. of Greater Chicago*, 698 F. Supp. 2d 1026, 1040 (N.D. Ill. 2010). It reinforces the possibility that Flynn's legitimate non-discriminatory explanation was a lie and that discrimination was his true motive.

The defense next claims "[t]he [AIM] statement does not link [Flynn's] displeasure with these employees . . . to a protected category, but explicitly links his displeasure with his belief that these employees were plotting against him[.]" (ECF No. 35 at 5.) Thus, they contend, the remarks and transfers imply only that Flynn is inclined to harshly punish dissent, not that his decisionmaking was colored by animus. This attempt to explain away Flynn's alleged reference to the protected categories of the subordinate officers is an issue for the trier of fact. The Seventh Circuit has explained, "remarks and other evidence that reflect a propensity by the decisionmaker to evaluate employees based on illegal criteria will suffice as direct evidence of discrimination even if the evidence stops short of a virtual admission of illegality." *Venters v. City of Delphi*, 123 F.3d 956, 973 (7th Cir. 1997). At summary judgment, the Court need not adduce whether Flynn's coupling of protected categories with a subterranean plot to sabotage him actually reflected racial animus. It is sufficient that a reasonable trier of fact might legitimately infer that it did.

Flynn's failure to follow protocol throughout the interview process and his inconsistent explanations for refusing to hire Williams also bolster Williams' case. "[A]n employer's failure to follow its own internal employment procedures can constitute evidence of pretext." *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 727 (7th Cir. 2005). Plaintiff contends it was common practice for the Chief and Assistant Chiefs to schedule second-round interviews with all the finalists for a position, but Flynn elected only to interview Price. Plaintiff further claims it was standard procedure for a hiring manager to entertain other top candidates if their first choice for a

job fell through, but Flynn refused to do so. The records also shows that Flynn stated he passed over Williams because he wanted to civilianize the Emergency Communications Manager position and appoint someone who would view it as a career. If those really were Flynn's goals, it seems odd that he ultimately gave the job to a 34-year veteran of the Greendale Police Force whose career was mostly behind him. "As a general rule, a reasonable trier of fact can infer pretext from an employer's shifting or inconsistent explanations for the challenged employment decision." *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 577 (7th Cir. 2015). The trier of fact is free to place this evidence on the side of the scale tipping toward pretext.

In sum, Williams has tendered sufficient evidence to satisfy his *McDonnell Douglas* burden on the race discrimination claim related to Flynn's refusal to hire him. Thus, summary judgment must be denied.

II. **A Reasonable Jury Could Conclude that Williams Was Not Hired for the Emergency Communication and Policy Director Position Due to His Sex.**

Williams also claims that he was the victim of sex or gender discrimination when the City and Director of Administration Robinson refused to hire him for the Emergency Communications and Policy Director position. (ECF No. 1 at 4-6.) Defendants argue that Williams was not hired for legitimate non-discriminatory reasons, having nothing to do with his sex, and no jury could find otherwise. (ECF No. 23 at 2-3.) Applying the *McDonnell Douglas* burden-shifting approach to Williams' sex-discrimination claims results in a different outcome. Because the record would not support a finding of sex discrimination in the City's non-hiring of Williams for the Emergency Communication and Policy Director position, Defendants are entitled to summary judgment.

**A. Williams Has Established a Prima Facie Case of Sex Discrimination.**

Defendants again do not dispute that Williams satisfies the first three elements of his prima facie case. (ECF No. 23 at 21-22.) But as with the claim against Flynn, Defendants incorrectly assert that Williams and De Haan were not similarly situated because Robinson preferred De Haan and was disappointed by Williams' interview. (*Id*. at 22-24.) Once again, this argument blurs the line between the plaintiff's burden to prove a prima facie case and the defendant's subsequent burden to provide a legitimate non-discriminatory explanation. Williams and De Haan both either met the minimum qualifications for the job or possessed equivalent combinations of education and experience. (ECF Nos. 30 at 14 & 35 at 11.) Nothing in the record indicates distinctions between Williams and De Haan "so significant that they render the comparison effectively useless."

*Humphries*, 474 F.3d at 405. Therefore, they were similarly situated, De Haan fell outside of Williams' protected class (male), and she was hired instead. That satisfies the prima facie burden.

### B. Robinson Has Articulated a Legitimate, Non-Discriminatory Reason for Choosing De Haan Over Williams.

Robinson testified that she was concerned by Williams' interview because his answers failed to provide "the meat or substance," and he did not give "specific examples even about how he would approach the work." (ECF No. 23 at 23.) She stated that the interview panel's consensus opinion was that Williams did not demonstrate the visionary thinking or ability to hit the ground running that they were looking for in an applicant. (*Id.*) In fact, following his interview, Robinson determined that she would never offer Williams the Emergency Communications and Policy Director position. (ECF No. 35 at 10.) On the other hand, Robinson knew De Haan's qualifications and was familiar with her work. (ECF No. 23 at 24.) This gave her the confidence to hire De Haan into the new role. (*Id.*) These non-discriminatory reasons for hiring De Haan over Williams satisfy Defendants' burden and shift the burden back to Williams to show pretext.

### C. Williams Has Not Come Forward with Evidence Sufficient to Allow a Finding of Pretext.

Williams' argument for pretext relies primarily on the fact that Robinson veered far afield of the established hiring process when she offered the Emergency Communication and Policy Director position to someone who had not applied or interviewed, and who was, in fact, a member of the initial interview panel. (ECF No. 30 at 20-21.) Even if it is true that Robinson deviated from standard procedure, that fact, standing alone, is insufficient to show pretext. The Seventh Circuit has held that while a "failure to follow . . . internal employment procedures can constitute evidence of pretext" *Rudin*, 420 F.3d at 727, a mere departure from common practice "does not prove gender or race discrimination." *Hobbs*, 573 F.3d at 463.

Much like the plaintiff in *Hobbs*, Williams has failed to allege "sexist statements or conduct in h[is] attempt to demonstrate pretext." *Id.* at 462. And he has offered no other evidence to show that the real reason for picking De Haan was gender discrimination. *See id.* Without these essential elements, he is effectively asking the Court to "sit as a superpersonnel department where [he] can have the merits of an employer's decision replayed to determine best business practices." *Blise v. Antaramian*, 409 F.3d 861, 867 (7th Cir. 2005). This is not the Court's prerogative. Thus, even if a jury could infer dishonesty from Robinson's unorthodox hiring procedure, there is nothing in

the record that would permit a finding that said hiring procedure was motivated by sex discrimination. Because Williams has not produced sufficient evidence to allow a finding of pretext, the Defendants are entitled to summary judgment on his claims relating to the Emergency Communication and Policy Director position.

## CONCLUSION

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment under Fed. R. Civ. P. 56 (ECF No. 22) is DENIED as to the race discrimination claims arising from former Police Chief Flynn's refusal to hire Williams.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment under Fed. R. Civ. P. 56 (ECF No. 22) is GRANTED as to the sex discrimination claims arising from City Director of Administration Sharon Robinson's decision not to hire Williams, and those claims are DISMISSED with prejudice.

Dated at Milwaukee, Wisconsin on October 20, 2021.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge